(97 P.3d 1063)

No. 90,708

RITA DIEPENBROCK, Individually and for and on Behalf of the Heirs at Law of JOHN DIEPENBROCK, Deceased, *Appellants,* v. WILLIAM EARL MERKEL, TOPEKA AIR AMBULANCE, INC., and PAUL JUEDES, MICT., *Appellees.*

—

Opinion filed September 24, 2004.

*Kevin L. Diehl* and *Eugene B. Ralston,* of Ralston, Pope & Diehl, LLC, of Topeka, for appellant.

*Daniel P. Hanson,* of Hanson & Gurney, of Overland Park, for appellee Topeka Air Ambulance, Inc.

*Clinton W. Lee* and *Mark A. Buck,* of Fairchild & Buck, P.A., of Topeka, for appellees William Earl Merkel and Paul Juedes.

Before GREEN, P.J., MALONE, J., and STEPHEN R. TATUM, District Judge, assigned.

GREEN, J.: John Diepenbrock (Diepenbrock) suffered a heart attack while a patron of Harrah's Prairie Band Casino (Casino) and received medical treatment from William Earl Merkel, Paul Juedes, and Topeka Air Ambulance, Inc. (defendants). Rita Diepenbrock (Rita), both as personal representative of Diepenbrock's estate and in her own capacity, sued the defendants. Rita maintained that the defendants wrongfully caused the death of Diepenbrock. The defendants moved to dismiss Rita's petition for lack of subject matter jurisdiction. The defendants sought dismissal of the action on the grounds that the Tribal Court of the Prairie Band Potawatomi Nation had exclusive jurisdiction over this case. The trial court granted the defendants' motion. On appeal, Rita contends that the trial court erred in granting the defendants' motion to dismiss for lack of subject matter jurisdiction. We disagree and affirm.

The facts in this case are not in dispute. On August 6, 2000, Diepenbrock suffered a heart attack at the Casino. The principal actions in this case occurred on tribal property. Merkel and Juedes furnished emergency services to Diepenbrock. Merkel and Juedes were employed by Potawatomi Tribal Emergency Services as Mobile Intensive Care Technicians. Moreover, they were on duty and furnished emergency services within the scope of their employment in attending to Diepenbrock. Diepenbrock and the defendants were all non-Indians.

Rita sued the defendants for the negligent treatment of Diepenbrock and for causing his death. She filed the suit in the Douglas County District Court. The trial court found it was undisputed that all parties to the action were non-Indians and that the alleged negligent emergency services occurred on reservation lands owned by the Potawatomi Tribe. The trial court dismissed the case on grounds it lacked subject matter jurisdiction because all events occurred on tribal property and decided the case should be transferred to the Tribal Court of the Prairie Band Potawatomi Nation.

Rita argues that the trial court erred in holding that it lacked subject matter jurisdiction to adjudicate her wrongful death claim. She argues that jurisdiction was proper in the trial court, not the tribal court, because all parties to this case were non-Indian and because resolution of this case in the state courts of Kansas would have had little to no effect on the sovereignty of the Prairie Band Potawatomi Nation.

In reviewing a motion to dismiss, our determination is the same as the trial court, namely whether the petition states any valid claim for relief when viewed in the light most favorable to the plaintiff and with every doubt resolved in the plaintiff's favor. See *University of Kansas Mem. Corp. v. Kansas Power & Light Co.*, 31 Kan. App. 2d 177, Syl. ¶ 1, 61 P.3d 741 (2003). Whether jurisdiction exists is a question of law over which this court's scope of review is unlimited. See *Nichols v. Kansas Political Action Committee*, 270 Kan. 37, 39, 11 P.3d 1134 (2000).

"Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories. [Citation omitted.]" *Oklahoma Tax Comm'n v. Potawatomi Tribe*, 498

U.S. 505, 509, 112 L. Ed. 2d 1112, 111 S. Ct. 905 (1991). "We 'can readily agree,' in accord with *Montana* [*v. United States*, 450 U.S. 544, 557, 67 L. Ed. 2d 493, 101 S. Ct. 1245 (1981)], that tribes retain considerable control over nonmember conduct on tribal land." *Strate v. A-1 Contractors*, 520 U.S. 438, 454, 137 L. Ed. 2d 661, 117 S. Ct. 1404 (1997). Indian reservations are separate and distinct nations inside the boundaries of the state of Kansas. Indian rights are protected by treaty with the United States. *Kaul v. Kansas Dept. of Revenue*, 266 Kan. 464, 970 P.2d 60 (1998), *cert. denied* 528 U.S. 812 (1999). The inherent sovereignty possessed by Indian tribes allowed them to form "their own laws and be ruled by them." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142, 65 L. Ed 2d 665, 100 S. Ct. 2578 (1980).

In determining that the state court lacked jurisdiction to consider the claim and that jurisdiction was proper in the tribal court, the United States Supreme Court in *Williams v. Lee*, 358 U.S. 217, 3 L. Ed. 2d 251, 79 S. Ct. 269 (1959), stated:

"There can be no doubt that to allow the exercise of state jurisdiction here would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves. It is immaterial that respondent is not an Indian. He was on the Reservation and the transaction with an Indian took place there. Cf. *Donnelly v. United States, supra; Williams v. United States, supra.* The cases in this Court have consistently guarded the authority of Indian governments over their reservations. Congress recognized this authority in the Navajos in the Treaty of 1868, and has done so ever since. If this power is to be taken away from them, it is for Congress to do it. *Lone Wolf v. Hitchcock*, 187 U.S. 553, 564-566[, 47 L. Ed 299, 23 S. Ct. 216]." 358 U.S. at 223.

This dispute involved a collection case filed in state court by a non-Indian who operated a general store on tribal land against a tribal member who purchased items on credit.

The district court in the case at bar utilized *Williams* for authority to hold that tribal courts have carte blanche authority over all matters occurring on tribal property and therefore it lacked subject matter jurisdiction. The district court's ruling and the appellee's arguments focus on the following language in *Williams*: "It is immaterial that respondent is not an Indian." Nevertheless, the reason why it was immaterial that the storeowner in *Williams* was

non-Indian was because the defendants were tribal members and all the events took place on tribal property. We are not presented with similar facts in the present case. The United States Supreme Court has yet to decide whether it was immaterial that the store owner was non-Indian in a case where all parties are non-Indian and all events occurred on tribal property.

The trial court also focused on the geographical basis for tribal jurisdiction. Although all the parties were non-Indian, all events occurred on tribal land owned in fee by the Tribe. It is apparent that the trial court based its decision on tribal sovereignty and on the fact that the incident occurred on tribal land.

A tribal court's jurisdiction is not absolute for all activities occurring on tribal property. See *Nevada v. Hicks*, 533 U.S. 353, 150 L. Ed. 2d 398, 121 S. Ct. 2304 (2001) (State officials operating on a reservation to execute a search warrant for evidence of off-reservation poaching crime are properly held accountable for tortious conduct and civil rights violations in either state or federal court, but not in tribal court.); *People of State of New York ex rel. Ray v. Martin*, 326 U.S. 496, 90 L. Ed. 261, 66 S. Ct. 307 (1946) (state courts have been allowed to try non-Indians who committed crimes against each other on a reservation); compare *Donnelly v. United States*, 228 U.S. 243, 269-72, 57 L. Ed. 820, 33 S. Ct. 449 (1913), and *Williams v. United States*, 327 U.S. 711, 90 L. Ed. 962, 66 S. Ct. 778 (1946) (if crime was by or against an Indian, tribal jurisdiction or that expressly conferred on other courts by Congress is exclusive), with *Fisher v. District Court*, 424 U.S. 382, 47 L. Ed. 2d 106, 96 S. Ct. 943 (1976) (tribal court had exclusive jurisdiction over an adoption proceeding when all parties were members of the Tribe and resided on its reservation).

A fact pattern similar to this case occurred in *Kizis v. Morse Diesel International, Inc.*, 260 Conn. 46, 794 A.2d 498 (2002). In *Kizis*, a non-Indian casino patron claimed she fell while entering the casino due to a negligently placed fieldstone in the entrance walkway. The plaintiff sued two non-Indian employees of the Tribe and the Mohegan Tribal Gaming Authority, who are not Indian, in state district court. The defendant employees moved to dismiss claiming tribal sovereign immunity. The district court denied the

motion. Although the issue of subject matter jurisdiction was not addressed in the district court, the Connecticut Supreme Court reversed the trial court's decision on grounds that the trial court lacked subject matter jurisdiction and the proper forum was in the Mohegan Gaming Disputes Court. 260 Conn. at 49-50.

In discussing the longstanding principles of sovereignty enjoyed by Indian tribes, the *Kizis* court stated: "Absent a clear and unequivocal waiver by the tribe or congressional abrogation, the doctrine of sovereign immunity bars suits for damages against a tribe." 260 Conn. at 53-54 (quoting *Romanella v. Hayward*, 933 F. Supp. 163, 167 [D. Conn. 1996]). The *Kizis* court outlined the history of the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* (1994), and the compact entered between the State of Connecticut and the Mohegan Tribe of Indians of Connecticut. The *Kizis* court concluded the statutes and compacts recognized by the federal, state, and tribal governments placed the negligence action at issue within the jurisdiction of the Tribe's Gaming Disputes Court. In explaining why the subject matter jurisdiction of the state courts should be limited, the *Kizis* court stated:

"The tribe. . . is a sovereign entity with the authority to create and enforce its own laws. The exercise of jurisdiction by state courts in this type of action would be in direct contradiction to the procedures established and consented to by the tribe after negotiation with the state of Connecticut and the federal government. Although Connecticut has a genuine interest in providing a judicial forum to victims of torts, the gaming act provided the state with a mechanism to negotiate with the tribe, to establish the manner in which to redress torts occurring in connection with casino operations on the tribe's land. As a result of these negotiations, the tribe maintained jurisdiction over tort actions of this type." 260 Conn. at 58.

Two years after *Kizis*, the Connecticut Court of Appeals decided *Ellis v. Allied Snow Plowing, Removal and Sanding Services Corp.*, 81 Conn. App. 110, 838 A.2d 237 (2004). Ellis alleged that Allied's negligent failure to clear snow and ice from a tribally owned parking lot caused her to be injured when she fell while attempting to board a bus. Allied contracted with the tribe to perform snow removal. The court emphasized several undisputed facts: (1) neither Ellis or Allied were members of the tribe; (2) the parking lot, al-

though on tribal land, was not on the reservation itself; and (3) the action was not against the tribe itself. The state district court denied Allied's motion to dismiss, finding it had subject matter jurisdiction to consider Ellis' claims. 81 Conn. App. at 112.

The *Ellis* court agreed with the district court and affirmed jurisdiction in the state courts. Allied argued *Kizis* controlled the case and jurisdiction was proper in the tribal court. The *Ellis* court disagreed and described its case as a "run of the mill" slip and fall accident, and just like the "run of the mill" highway accident case in *Strate v. A-1 Contractors*, 520 U.S. 438, 137 L. Ed. 2d 661, 117 S. Ct. 1404 (1997). 81 Conn. App. at 115. In *Strate*, the United States Supreme Court determined that three affiliated tribes lacked inherent authority to adjudicate a personal injury claim between nonmembers arising out of an automobile accident occurring on a highway owned and maintained by the state of North Dakota under a right-of-way granted to the state by the United States. As a result, the *Ellis* court determined that the tribal court did not have jurisdiction to adjudicate Ellis' claim. 81 Conn. App. at 113-15. The *Ellis* court also found that Allied could not cloak itself in tribal sovereign immunity as did the defendants in *Kizis* by clarifying that the non-Indians in *Kizis* were employees and Allied was an independent contractor. Allied had specifically contracted for responsibility for injuries resulting from performance of its obligations. 81 Conn. App. at 116-17.

The *Ellis* court also addressed Allied's argument that the tribal court is the proper forum for the case due to the direct effect on the political integrity, economic security, and health and welfare of the tribe. The *Ellis* court found that it could not discern any way the action in the state court could have direct adverse effects on the economic interests of the tribe. The *Ellis* court concluded that the state court had subject matter jurisdiction to adjudicate the merits of Ellis' cause of action. 81 Conn. App. at 118-19.

Diepenbrock also argues that the district court could exercise concurrent jurisdiction over this case without offending tribal sovereignty. Diepenbrock cites *Lemke v. Brooks*, 614 N.W.2d 242 (Minn. App. 2000), where the district court decided it could exercise concurrent jurisdiction over a wrongful death action filed by

the non-Indian mother of the non-Indian decedent who was murdered by her Indian husband on tribal land. Regarding jurisdiction between state and tribal courts, the *Lemke* court stated the guiding federal principle is deference. 614 N.W.2d at 246. "Abstention by a state court is appropriate when the exercise of state court jurisdiction 'would undermine the authority of the tribal courts' or 'infringe on the right of Indians to govern themselves.' [Citations omitted.]" 614 N.W.2d at 246. The *Lemke* court stated that Lemke did not seek damages against the tribe, tribal official, or tribal business, or implicate the sovereign immunity of the tribe, and the state court was not required to defer to the jurisdiction of the tribe. The *Lemke* court also held Congress' Public Law 83-280, (18 U.S.C. § 1162 [1988]; 28 U.S.C. § 1360 [1988]), which granted Minnesota broad criminal and limited civil jurisdiction over almost all Indian country, applied to the wrongful death action at issue and gave the state court subject matter jurisdiction. 614 N.W.2d at 246. Kansas has never been under Public Law 83-280. See *State ex rel. Stephan v. Finney,* 251 Kan. 559, 575, 836 P.2d 1169 (1992).

Perhaps the critical fact in this case is that all events surrounding Diepenbrock's cause of action occurred on tribal property. Unlike the facts of *Ellis,* where the incident happened on land that was not part of the reservation, the trial court here specifically found that the alleged negligent emergency services occurred on reservation lands. The law recognizes a preference for tribal sovereignty and jurisdiction or deference to the tribal court over matters concerning their members and their territories. *Oklahoma Tax Comm'n v. Potawatomi Tribe,* 498 U.S. at 509 (Indian tribes have inherent sovereign authority over their members and territories). We find no law, state or federal, that would interfere with this deference. Although the district court relied almost solely on the geographical nature of this case, we find other factors support the trial court's decision.

It would undermine the authority of the tribal courts over reservation affairs and hence would infringe on the right of the Prairie Band Potawatomi Nation to govern themselves if jurisdiction did not reside in the tribal courts in this case. See *Fisher,* 424 U.S. 382; *Lemke,* 614 N.W.2d at 246; *Kizis,* 260 Conn. at 58. General

Potawatomi law supports the district court's decision to find jurisdiction over this case in the tribal court.

The Potawatomi Law and Order Code, Title 1, § 1-1-1 (2000), provides the tribe with authority over all land within the boundaries of the reservation. The tribe also has authority over persons and property outside the reservation concerning the transaction of business on the reservation and commission of tortious acts on the reservation. The Potawatomi Tribal Court has express jurisdiction over all persons, "including non-Indians," located or doing business on the tribe's reservation. Title 2, § 2-1-3(A). This same section also gives the tribe the "exclusive right to regulate gaming facilities [including] the right to determine when and how to compensate for claims for injuries occurring with respect to such gaming facilities." Title 2, § 2-1-3 (C) provides the Tribal Court with jurisdiction over "[a]ll tort claims arising from injuries directly or indirectly involved or related to the Nation's gaming facilities." The Potawatomi Law and Order Code also provides express jurisdiction:

"The Tribal Courts shall have exclusive jurisdiction over all civil matters except where tribal jurisdiction is prohibited by federal law. . . . The determination of whether the Tribal Court has jurisdiction over Indians or non-Indians will be conducted in the first instance in the Tribal Court itself." Section 2-1-3(b).

This last sentence indicates that tribal court remedies must be exhausted before tribal court jurisdiction can be challenged.

The next critical fact in this case is that all the incidents in this case occurred on the Casino premises. The Tribal State Gaming Compact between the Prairie Band Potawatomi Nation in Kansas and the State of Kansas, dated April 20, 1995, also supports the district court's decision finding no subject matter jurisdiction in the state court. The United States Congress passed the Indian Gaming Regulatory Act in 1988, 25 U.S.C. § 2701 *et seq.* (1988), allowing the states to limit Indian casinos to the type of gaming allowed by the state and requiring the states to negotiate compacts regarding the authorized gaming. Four tribes in Kansas, including the Prairie Band Potawatomi Nation, began negotiating gaming compacts with the state. After legal challenges and legislative changes, in October 1995 the Bureau of Indian Affairs approved a

compact with the Prairie Band Potawatomi Nation. See *Burdett v. Harrah's Kansas Casino Corp.*, 294 F. Supp. 2d 1215, 1226 (2003).

The Potawatomi compact gives the tribe civil jurisdiction over Indians and non-Indians for "all transactions or activities which relate to Class III gaming on the Reservation." Tribal State Gaming Compact, Section 14(a) (1995). Moreover, the tribe is treated as if it were the State for "[t]ort claims arising from alleged injuries to patrons of the Tribe's gaming facilities." Compact, Section 3(D).

Subject matter jurisdiction is the power or authority of a court to hear and decide a particular type of action. *Gentzel v. Williams*, 25 Kan. App. 2d 552, 559, 965 P.2d 855 (1998). A state trial court cannot handle cases belonging to a type over which another court has been given exclusive jurisdiction. *C.J. Hendry Co. v. Moore*, 318 U.S. 133, 87 L. Ed. 663, 63 S. Ct. 499 (1943) (federal courts had been given exclusive jurisdiction). Here, the language of the compact has given the tribal court jurisdiction over tort claims arising from alleged injuries to patrons of the Tribe's gaming facilities. The Tribe's authority to decide these types of cases is a clear limitation on the state trial court's subject matter jurisdiction.

Moreover, we find that this case is similar to *Kizis*. Like *Kizis*, all the parties were non-Indian. In addition, Merkel and Juedes were employees of the Prairie Band Potawatomi Indian Nation. All the events occurred on tribal owned land, specifically on the premises of the Casino. Finally, Diepenbrock was a patron or customer of the Casino and was engaging in the business of the Tribe when he became ill.

As a result, we determine that the trial court's granting of the defendants' motion to dismiss was proper.

Affirmed.